182 Cal.App.4th 590 (2010)
ST. JOHN'S WELL CHILD AND FAMILY CENTER et al., Petitioners,
v.
ARNOLD SCHWARZENEGGER as Governor, etc., et al., Respondents;
DARRELL STEINBERG, Individually and as President pro Tempore, etc., et al., Interveners.
No. A125750.
Court of Appeals of California, First District, Division Two.
March 2, 2010.
*593 Kirkland & Ellis, R. Alexander Pilmer and Derek Milosavljevic for Petitioner St. John's Well Child and Family Center.
Neighborhood Legal Services of Los Angeles County, Abby McClelland, Katherine E. Meiss, David Pallack and Barbara Siegel for Petitioners Rosa Navarro and Lionso Guzman.
Disability Rights Advocates, Sydney Wolinsky, Katrina K. Corbit and Anna Levine for Petitioners Californians for Disability Rights, California Foundation for Independent Living Centers, Nevada-Sierra Regional In-Home Support Services Public Authority, Liane Yasumoto, and Judith Smith.
Western Center on Law & Poverty, Richard A. Rothschild and Nu Usaha for Petitioners.
Miguel A. Marquez, Acting County Counsel, Tamara A. Lange, Lead Deputy County Counsel, Juniper Lesnik and Greta S. Hansen, Deputy County Counsel, for County of Santa Clara as Amicus Curiae on behalf of Petitioners.
Rothner, Segall, Greenstone & Leheny, Anthony R. Segall; Altshuler Berzon, Scott A. Kronland and Danielle E. Leonard for SEIU California State Council, United Domestic Workers, and California United Homecare Workers as Amici Curiae on behalf of Petitioners.
*594 O'Melveny & Myers, Robert M. Schwartz, Robert C. Welsh, David A. Lash, Sandeep N. Solanki, Jordan P. Raphael and Robert Silvers for Children Now, Valley Community Clinic, Eisner Pediatric & Family Medical Center, The Saban Free Clinic, YWCA Monterey County, Westside Family Health Center, Community Clinic Association of Los Angeles County, and The Legal Aid Association of California as Amici Curiae on behalf of Petitioners.
Paul, Hastings, Janofsky & Walker, Eve M. Coddon, Cameron W. Fox and Amanda A. Bollinger for Aids Project Los Angeles as Amicus Curiae on behalf of Petitioners.
Reich, Adell & Cvitan, Laurence S. Zakson, William Y. Sheh and Aaron G. Lawrence for Los Angeles County Democratic Central Committee as Amicus Curiae on behalf of Petitioners.
Martin A. Weiss for Riverside County Democratic Central Committee as Amicus Curiae on behalf of Petitioners.
Edmund G. Brown, Jr., Attorney General, Jonathan K. Renner, Assistant Attorney General, Zackery P. Morazzini and Ross C. Moody, Deputy Attorneys General, for Respondents.
Neilsen, Merksamer, Parrinello, Mueller & Naylor, Steven A. Merksamer, Richard D. Martland and Kurt Oneto for George Deukmejian, Pete Wilson, Gray Davis, the California Chamber of Commerce, the California Taxpayers' Association and the California Business Roundtable as Amici Curiae on behalf of Respondents.
Remcho, Johansen & Purcell, Robin B. Johansen, James C. Harrison, Thomas A. Willis, Karen Getman and Margaret R. Prinzing for Interveners.

OPINION
KLINE, P. J.

INTRODUCTION
The current economic downturn affects all Californians, but those suffer most who receive essential health and welfare assistance from agencies dependent upon state tax revenues. The needs of such vulnerable citizens so exceed the state's diminished ability to pay for them that "Sophie's choices" are presented. Government must choose between and among equally needy *595 groups, knowing those not favored will be devastated. The responsible decision makers are the Legislature and the Governor. In the context of the constitutionally prescribed budget process, the power of the pursei.e., the power to appropriate public fundsbelongs only to the Legislature. With respect to a bill containing appropriations, the Governor can only sign or veto the measure in its entirety or "reduce or eliminate one or more items of appropriation." (Cal. Const., art. IV, § 10, subd. (e).) The question in this case is whether the Governor exceeded these limited powers.
In this original writ proceeding, we consider constitutional challenges to the Governor's use of the line-item veto authority provided in article IV, section 10, subdivision (e) of the California Constitution to increase the amount of midyear reductions (further reducing the reductions) made by the Legislature to the Budget Act of 2009. (Stats. 2009, 3d Ex. Sess. 2009-2010, ch. 1, approved by Governor Feb. 20, 2009 (hereafter 2009 Budget Act).) We shall conclude the Governor's exercise of the challenged veto power does not exceed his constitutional authority.
Petitioners include St. John's Well Child and Family Center, a nonprofit network of five community health centers and six school-based clinics in medically underserved areas of Los Angeles County, and other entities and individuals throughout the state whose programs and lives will be drastically affected by the further reductions at issue here.[1]
Respondents are Arnold Schwarzenegger, the Governor of the State of California, and John Chiang, who, as the Controller of the State of California, is responsible for administration of the state's finances, including disbursement of funds appropriated by law.[2] The Controller does not take a position on the merits of this litigation.
Interveners are Darrell Steinberg, in his official capacity as President pro Tempore of the California State Senate, and in his personal capacity as a *596 resident and taxpayer of Sacramento County, and Karen Bass, in her official capacity as Speaker of the California Assembly, and in her personal capacity as a resident and taxpayer of Los Angeles County.
Several amici curiae have filed briefs supporting the various parties.[3]
Petitioners and interveners contend that the Governor's action exceeded constitutional limits because the individual budget cuts he further reduced were not "items of appropriation" (Cal. Const., art. IV, § 10, subd. (e)) that could be individually vetoed or reduced. They further contend that the Governor attempted to exercise authority belonging solely to the Legislature in violation of article III, section 3 of the California Constitution.
Petitioners and interveners seek original relief in this court pursuant to article IV, section 10 of the California Constitution, Code of Civil Procedure sections 387 and 1085, and California Rules of Court, rule 8.485 et seq. They seek to enjoin the Controller from enforcing or taking any steps to enforce the Governor's vetoes of certain provisions of Assembly Bill No. 1 (2009-2010 4th Ex. Sess.) (hereafter Assembly Bill 4X 1), as embodied in the Budget Act of 2009Revisions (Stats. 2009, 4th Ex. Sess. 2009-2010, ch. 1, hereafter Revised 2009 Budget Act). (See Assem. Bill 4X 1, as amended by Sen., July 23, 2009, and approved by Governor July 28, 2009 [with certain deletions, revisions and reductions (hereafter Governor's Veto Message)].) Although we customarily decline to exercise such jurisdiction, preferring initial disposition by the superior court, this case involves issues of sufficient public importance and urgency to justify departing from the usual course. The significance of the issues and need for prompt resolution warrant exercise of our original jurisdiction. (Legislature v. Eu (1991) 54 Cal.3d 492, 500 [286 Cal.Rptr. 283, 816 P.2d 1309]; Raven v. Deukmejian (1990) 52 Cal.3d 336, 340 [276 Cal.Rptr. 326, 801 P.2d 1077]; see also Planned Parenthood Affiliates v. Van de Kamp (1986) 181 Cal.App.3d 245, 262-265 *597 [226 Cal.Rptr. 361].) Therefore, on September 21, 2009, we issued an order to show cause why the relief sought should not be granted and thereafter held oral argument.[4]

BACKGROUND
On February 20, 2009, the Governor signed into law the 2009 Budget Act, which set forth various appropriations of state funds for the 2009-2010 fiscal year. California's economy worsened, the revenue assumptions on which the 2009 Budget Act was based proved to be far too optimistic, and the state's overall cash flow positions continued to worsen. The Governor proclaimed a fiscal crisis pursuant to California Constitution, article IV, section 10, subdivision (f),[5] and the Legislature assembled in a special session to address the *598 fiscal emergency. After months of negotiations, the Legislature passed Assembly Bill 4X 1 on July 23, 2009. The final budget package enacted as Assembly Bill 4X 1 contained $24.2 billion in budget solutions, including $15.6 billion in cuts, $3.9 billion in additional revenues, $2.1 billion in borrowing, $1.5 billion in fund shifts, and $1.2 billion in deferrals and other adjustments.
On July 28, 2009, the Governor exercised his line-item veto to reduce or eliminate several items contained in Assembly Bill 4X 1, and then signed the measure into law. (Rev. 2009 Budget Act.) The Governor vetoed 27 different line items of sections of Assembly Bill 4X 1. The effect of these vetoes was to further reduce the total amount appropriated in the 2009 Budget Act by more than $488 million. Many of the items reduced by the Governor had already been reduced by the Legislature from the amounts appropriated in the 2009 Budget Act. The Governor's signing message explained that his cuts and eliminations to the spending bill were for the most part designed "to increase the reserve and to reduce the state's structural deficit." (Rev. 2009 Budget Act, Governor's Veto Message for §§ 18.00, 18.10, 18.20, 18.40; see also id., §§ 17.50, 18.50.)
This original mandamus action by petitioners and interveners followed,[6] in which they challenge the Governor's use of the line-item veto on seven *599 sections of Assembly Bill 4X 1, specifically, sections 568 and 570 through 575.[7] These vetoes impact the seven sections of Assembly Bill 4X 1 as follows:
Section 17.50, further reducing the general fund reduction for the Department of Aging by $6,160,000;
Section 18.00, subdivision (a), further reducing general fund funding for local assistance of the Medi-Cal program by $60,569,000; and section 18.00, subdivision (e), eliminating funding for Community Clinic Programs;
Section 18.10, further reducing the funding for various programs administered by the Office of AIDS by $52,133,000, further reducing funding for the Domestic Violence Program by $16,337,000,[8] further reducing funding *600 for the Adolescent Family Life Program by $9,000,000, and further reducing funding for the Black Infant Health Program by $3,003,000;
Section 18.20, further reducing the Healthy Families Program by $50,000,000;
Section 18.30, further reducing Regional Center Purchase of Services for children up to age five by $50,000,000;
Section 18.40, further reducing funding of the Caregiver Resource Centers by $4,082,000; and
Section 18.50, further reducing general fund funding to the In-Home Supportive Services Program by $37,555,000.

I. Constitutional Framework of the Veto Power
The question presented as a matter of first impression is whether the Governor's line-item veto power encompasses the ability to further reduce mid-year reductions made by the Legislature to appropriations originally made in the 2009 Budget Act. Although the particular issue may be novel, we are not without guidance, as the California Supreme Court, in Harbor v. Deukmejian (1987) 43 Cal.3d 1078 [240 Cal.Rptr. 569, 742 P.2d 1290] (Harbor), extensively described the constitutional framework within which the Governor exercises the line-item veto.
(1) "The California Constitution declares that the legislative power of the state is vested in the Legislature (art. IV, § 1) and the executive power in the Governor (art. [V], § 1). Unless permitted by the Constitution, the Governor may not exercise legislative powers. (Art. III, § 3.) He may veto a bill `by returning it with any objections to the house of origin,' and it will become law only if `each house then passes the bill by rollcall vote ... two thirds of the membership concurring....' [(Art. IV, § 10, subd. (a).)] If the Governor fails to act within a certain period of time, the measure becomes law without his signature. (Art. IV, § 10, subd. [(b)].) The Governor's veto power is more extensive with regard to appropriations. He may `reduce or eliminate one or more items of appropriation while approving other portions of a bill.' Such items may be passed over his veto in the same manner as vetoed bills. (Art. IV, § 10, subd. [(e)].)" (Harbor, supra, 43 Cal.3d at p. 1084, italics added.)[9]
(2) The Harbor court agreed with the petitioners there that "in vetoing legislation, the Governor acts in a legislative capacity, and that in order to *601 preserve the system of checks and balances upon which our government is founded, he may exercise legislative power only in the manner expressly authorized by the Constitution. Since that document only authorizes the Governor to veto a `bill' or to reduce or eliminate `items of appropriation' the Governor may not veto part of a bill which is not an `item of appropriation.'" (Harbor, supra, 43 Cal.3d. at p. 1084.)
Tracking the historical development of the veto power from its origins in Rome, where the tribune of plebeians had the power to disapprove measures recommended by the senate, Harbor explained that "[t]he word, `veto' means `I forbid' in Latin. Then, as now, the effect of the veto was negative, frustrating an act without substituting anything in its place." (Harbor, supra, 43 Cal.3d at p. 1085, citing Zinn, The Veto Power of the President (1951) 12 F.R.D. 207.) Evolving in the United States as "an integral part of the system of checks and balances" (Harbor, at p. 1085), the veto power at the federal level is circumscribed by the limitation that the President may approve or reject a bill in its entirety, but may not select portions of a bill for disapproval. "As a much-quoted early case commented, `the executive, in every republican form of government, has only a qualified and destructive legislative function, and never creative legislative power.' (State v. Holder (1898) 76 Miss. 158 [23 So. 643, 645].) [¶] While the rule prohibiting selective exercise of the veto is unyielding in the federal system, most states have provided an exception for items of appropriation." (Harbor, at p. 1086; see Thirteenth Guam Legislature v. Bordallo (D. Guam 1977) 430 F.Supp. 405, 410.)
"In California, the Constitution of 1849 included a gubernatorial veto provision similar to that contained in the United States Constitution. (Cal. Const. of 1849, art. IV, § 17 ....) The Constitution of 1879 added the item veto power, allowing the Governor to `object to one or more items' of appropriation in a bill which contained several `items of appropriation.' (Cal. Const. of 1879, art IV, § 16.) By constitutional initiative in 1922, the Governor was empowered not only to eliminate `items of appropriation' but to reduce them, while approving other portions of a bill. (Art. IV, § 10, subd. ([e]).) The 1922 amendment also directed the Governor to submit a *602 budget to the Legislature containing his recommendation for state expenditures. (Art. IV, § 12, subd. (a).)" (Harbor, supra, 43 Cal.3d at p. 1086, italics added.)[10]
(3) The item veto and the line-item veto allowing the Governor to eliminate or reduce items of appropriation do not confer the power to selectively veto general legislation. (Harbor, supra, 43 Cal.3d at p. 1087; Lukens v. Nye (1909) 156 Cal. 498, 501-503 [105 P. 593].) The Governor may not veto part of a bill that is not an "item of appropriation." (Harbor, at pp. 1084-1085, 1088-1089.)
(4) "[A]rticle III, section 3 provides that one branch of government may not exercise the powers granted to another `except as permitted by this Constitution.' Case law, commentators, and historians have long recognized that in exercising the veto the Governor acts in a legislative capacity. [Citations.] ... [¶] It follows that in exercising the power of the veto the Governor may act only as permitted by the Constitution. That authority is to veto a `bill' (art. IV, § 10, subd. (a)) or to `reduce or eliminate one or more items of appropriation' (id., subd. ([e]))." (Harbor, supra, 43 Cal.3d at pp. 1088-1089, fn. omitted.)
The dispositive issue, then, is whether the seven sections of Assembly Bill 4X 1 that the Governor further reduced here were "items of appropriation" (Cal. Const., art. IV, § 10, subd. (e)), upon which the Governor could exercise his line-item veto power. We are convinced that they are.

II. "Item of Appropriation"
Petitioners and interveners contend that, because the challenged items in Assembly Bill 4X 1 reduced the amounts previously appropriated in the 2009 Budget Act, these items were not "appropriations." They maintain that a "reduction" cannot be an "appropriation," and point out that there are no instances in which a California governor has ever before exercised the line-item veto in this manner.
*603 Since the passage of the 1922 constitutional amendment empowering the Governor to exercise the line-item veto, our Supreme Court has addressed the question of what constitutes an "item of appropriation" subject to the Governor's line-item veto power in two important cases, Harbor, supra, 43 Cal.3d 1078, and Wood v. Riley (1923) 192 Cal. 293 [219 P. 966], and we turn to them for guidance.

A. Judicial definitions of "item of appropriation"

Wood v. Riley, supra, 192 Cal. 293, was decided in 1923, shortly after the Constitution was amended to allow the Governor to use the line-item veto to reduce as well as eliminate "items of appropriation." In that case, the Legislature added to a budget bill a proviso requiring the Controller to transfer 1 percent of the appropriations set aside for salaries and support of several teachers' colleges and special schools to the state department of education as the administrative allotment of the department. (Id. at pp. 294-296.) The Governor vetoed the proviso. (Id. at p. 296.) The director of education sought to enforce the proviso, notwithstanding the Governor's disapproval, arguing that the Governor was attempting to veto part of a sentence in an appropriation bill that did not appropriate money, but simply provided for a transfer, as a matter of bookkeeping, of a percentage of funds already appropriated. (Id. at p. 297; see Harbor, supra, 43 Cal.3d at p. 1091, fn. 13.) The Supreme Court upheld the veto, holding that although it took no new money from the state treasury, the proviso "was a specific setting aside of an amount, not exceeding a definite fixed sum, for the payment of certain particular claims or demands .... It appears in no other light than as amounting to an item of appropriation in that it adds an additional amount to the funds already provided for the administration of the office of the director of education through the sums appropriated for the use of the state board of education and the superintendent of public instruction. This court has held that `by a specific appropriation' was understood `an Act by which a named sum of money has been set apart in the treasury and devoted to the payment of a particular claim or demand[.] ... The Fund upon which a warrant must be drawn must be one the amount of which is designated by law, and therefore capable of definitive exhaustiona Fund in which an ascertained sum of money was originally placed, and a portion of that sum being drawn an unexhausted balance remains, which balance cannot be thereafter increased except by further legislative appropriation.' (Stratton v. Green [(1872)] 45 Cal. 149, 151. [Citations.]) ... The proviso, therefore, appears to fill all the requirements of a distinct item of appropriation of so much of a definite sum of money as may be required for a designated purpose connected with the state government." (Wood v. Riley, at pp. 303-304.)
*604 The Supreme Court was also persuaded that the Legislature intended to insulate its appropriation for the general administrative office of the department from the Governor's veto, which it could not do if it directly appropriated funds for that office. (Wood v. Riley, supra, 192 Cal. at pp. 304-305.) "It is very clear that the situation presented is that no appropriation having been recommended by the Governor, or included in the proposed budget bill, for the payment of the `salaries and support of the general administrative office of the division of normal and special schools,' other than the general provisions for the support of the state board of education and the state superintendent of schools, the legislature attempted, by the inclusion of the proviso in the bill, to make such additional appropriation for such purpose under the guise of an administrative allotment. Therefore, looked at in the light of what it was intended to accomplish, and what it would have accomplished if allowed to stand, one cannot escape the conviction that it worked an appropriation. It added a specific amount to the allowance already made for the use of the state board of education and the state superintendent of schools." (Ibid.) The court concluded the Legislature could not "by indirection, defeat the purpose of the constitutional amendment giving the Governor power to control the expenditures of the state, when it could not accomplish that purpose directly or by an express provision in appropriation bills." (Id. at p. 305.)
In Harbor, supra, 43 Cal.3d 1078, the Legislature enacted a budget for the 1984-1985 fiscal year. One item in the budget was an appropriation for aid to families with dependent children (AFDC) for over $1.5 billion. Ten days later, the Legislature passed a trailer bill containing 71 sections enacting, amending and repealing numerous provisions in numerous codes. (Sen. Bill No. 1379 (1983-1984 Reg. Sess.).) The trailer bill was not to become operative unless the 1984-1985 Budget Act was also passed. Among the trailer bill's provisions was section 45.5 (Sen. Bill No. 1379, Stats. 1984, ch. 268, § 45.5, p. 1383 (hereafter section 45.5)), amending the Welfare and Institutions Code to allow AFDC benefits to be paid under certain circumstances from the time a benefits application was made, rather than from the date the application was processed. (Harbor, at pp. 1082-1083.) In approving the 1984-1985 Budget Act, the Governor reduced the item containing the AFDC allotment by more than $9 million. Two days later, he approved the trailer bill, but purported to veto section 45.5 relating to the timing of the benefits payments. (Harbor, at pp. 1082-1083.)
The Supreme Court held that the Governor's purported veto of section 45.5 of the trailer bill relating to timing of the benefits was not justified as the provision was not an "item of appropriation." (Harbor, supra, 43 Cal.3d at pp. 1090-1091.) However, the court also held that the trailer bill violated the single-subject rule of article IV, section 9 of the California Constitution. (43 Cal.3d at p. 1094.) Therefore, the court gave its determination as to both *605 rulings prospective effect only, as the Governor would have had the power to veto section 45.5 had it been passed by the Legislature as a separate bill. The net effect was that the veto was not invalidated, but only that section of the bill would be rendered inoperative. (43 Cal.3d at pp. 1101-1102.)
In reaching its determination that section 45.5 was not an "item of appropriation" and, therefore, that the Governor could not selectively veto the item without vetoing the entire bill, Harbor recognized that "[t]he term has been defined in various ways. Wood v. Riley, supra, 192 Cal. 293, 303, defines it as `a specific setting aside of an amount, not exceeding a definite sum, for the payment of certain particular claims or demands ... not otherwise expressly provided for in the appropriation bill.' It `adds an additional amount to the funds already provided.' In Bengzon [v. Secretary of Justice (1937) 299 U.S. 410 [81 L.Ed. 312, 57 S.Ct. 252]] the term was described as a bill whose `primary and specific aim ... is to make appropriations of money from the public treasury.' (299 U.S. 410 at p. 413 [81 L.Ed. 312 at p. 314].) Other cases employ somewhat different definitions (e.g., Jessen Associates, Inc. v. Bullock (Tex. 1975) 531 S.W.2d 593, 599 [`setting aside or dedicating of funds for a specified purpose']; Commonwealth v. Dodson (1940) 176 Va. 281 [11 S.E.2d 120, 127] [`an indivisible sum of money dedicated to a stated purpose'])." (Harbor, supra, 43 Cal.3d at p. 1089.)
Harbor concluded that the provision at issue did not qualify "as an item of appropriation under any of these definitions. It does not set aside money for the payment of any claim and makes no appropriation from the public treasury, nor does it add any additional amount to funds already provided for. Its effect is substantive. Like thousands of other statutes, it directs that a department of government act in a particular manner with regard to certain matters. Although as is common with countless other measures, the direction contained therein will require the expenditure of funds from the treasury, this does not transform a substantive measure to an item of appropriation. We agree with petitioners that section 45.5 only expresses the Legislature's intention that the AFDC appropriation, whatever its amount, must be used to provide benefits to recipients from the date of application under certain circumstances." (Harbor, supra, 43 Cal.3d at pp. 1089-1090.)
The Harbor court was not persuaded by the Governor that the Legislature had attempted to separate the appropriation and its purpose into separate measures in order to evade a veto of the entire indivisible measure. (Harbor, supra, 43 Cal.3d at pp. 1090-1091.) According to the court, "[b]oth were specified in the [1984-1985] Budget Act, that is, over $1.5 billion was appropriated for the purpose of funding AFDC. The Governor is bound by this `purpose' as set forth in the budget. If the Legislature chooses to budget *606 by a lump sum appropriation, he may eliminate or reduce the amount available for the purpose as set forth therein. Here, the Governor not only reduced the `item of appropriation' as set forth in the budget, but he divided it into its supposed component parts, assigned a purpose and amount to the part he disapproved, reduced the total by that amount, and attempted to veto a portion of a substantive bill which he claims contains the `subject of the appropriation.' We are aware of no authority [that] even remotely supports the attempted exercise of the veto in this manner." (Id. at pp. 1090-1091.)
The court concluded that even the Legislature's attempt to avoid the Governor's veto was not sufficient justification to allow the term to be interpreted to embrace a substantive measure like section 45.5 where no definition of the term "item of appropriation" as used in the Constitution including that used in Wood v. Riley, supra, 192 Cal. 293could "reasonably embrace a provision like section 45.5, which does not set aside a sum of money to be paid from the public treasury." (Harbor, supra, 43 Cal.3d at p. 1092.) "The fact that in Wood the term `item of appropriation' was construed in such a way as to facilitate the Governor's power to veto a portion of the budget bill which could reasonably be encompassed within the meaning of that term does not provide authority for holding ... that the Governor may veto part of a general billa power denied him by the Constitutionin order to foil an alleged legislative attempt to evade the veto." (Id. at p. 1092, fn. omitted.)
Following Harbor, supra, 43 Cal.3d 1078, the Court of Appeal in California Assn. for Safety Education v. Brown (1994) 30 Cal.App.4th 1264 [36 Cal.Rptr.2d 404] (Safety Education) described an appropriation similarly, as "a legislative act setting aside `a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose.' (Ryan v. Riley (1924) 65 Cal.App. 181, 187 [223 P. 1027].)" (Safety Education, at p. 1282.)[11]

B. Judicial definitions applied

As in Wood v. Riley, supra, 192 Cal. 293, and unlike in Harbor, supra, 43 Cal.3d 1078, the challenged items presented to the Governor in Assembly *607 Bill 4X 1, each "appear[] to fill all the requirements of a distinct item of appropriation of so much of a definite sum of money as may be required for a designated purpose connected with the state government." (Wood v. Riley, at p. 304, italics added.) Assembly Bill 4X 1 "set aside a sum of money to be paid from the public treasury" (Harbor, at p. 1092), albeit a smaller sum than that initially appropriated in the 2009 Budget Act.
Contending that only an increase in spending authority amounts to an appropriation, petitioners, interveners, and their amici curiae emphasize that none of the definitions of "item of appropriation" contained in the cases refer to a decrease in the spending authorized by a previously enacted budget, and maintain that such a reduction may not be deemed an item of appropriation. They further argue that because the 2009 Budget Act had already set aside sums of money to be paid by the treasury for specific purposes, those items and sections of Assembly Bill 4X 1 that proposed only reductions to existing, previously enacted appropriations did not satisfy the requirement of money set aside for a particular purpose. The argument, in other words, is that a reduction in a set-aside cannot itself be considered a set-aside. We disagree.
The cases do not require, as petitioners and interveners suggest, that only items that add amounts to funds already provided constitute "items of appropriation." Governor Deukmejian's claim failed in Harbor, because section 45.5 of the trailer bill did not qualify "as an item of appropriation under any of [the] definitions" reviewed by the court. (Harbor, supra, 43 Cal.3d at p. 1089, italics added.) "It does not set aside money for the payment of any claim and makes no appropriation from the public treasury, nor does it add any additional amount to funds already provided for. Its effect is substantive." (Ibid., italics added.) Furthermore, unlike section 45.5 in Harbor, which referred to no sum of money, much less a definite or ascertainable sum, the Assembly Bill 4X 1 items here specified definite amounts by which the original appropriations would be reduced.
(5) Whether spending authority is increased or decreased, it is still spending authority. Although described as reductions in specified items and sections, the amounts set aside in Assembly Bill 4X 1 nevertheless direct the "specific setting aside of an amount, not exceeding a definite fixed sum, for the payment of certain particular claims or demands ...." (Wood v. Riley, supra, 192 Cal. at pp. 303-304; see Harbor, supra, 43 Cal.3d at p. 1092.) The items in Assembly Bill 4X 1 eliminated or further reduced by the Governor's veto capped the spending authority at a lesser amount than had the 2009 Budget Act. The Controller could not thereafter disburse, nor could the recipients of the funds thereafter draw upon, a larger amount than that set *608 aside by the Legislature for the specified purposes. Once enacted, an appropriation "`cannot be thereafter increased except by further legislative appropriation.' [Citations.]" (Wood v. Riley, at p. 303, citing, among others, Stratton v. Green, supra, 45 Cal. at p. 151.)
(6) There is no substantive difference between gubernatorial reduction of an item of appropriation in the original 2009 Budget Act, to which interveners and petitioners do not object, and gubernatorial reduction of such item in a subsequent amendment to the 2009 Budget Act, i.e., Assembly Bill 4X 1. Both involve changes in spending authority.[12]
Adoption of the view of petitioners, interveners and their amici curiae that the challenged vetoes were not "items of appropriation" would permit the Legislature, in a single bill, to selectively make multiple reductions in previous appropriations, leaving the Governor only the power to veto the entire billa limitation the 1922 amendment to article IV of the California Constitution was specifically designed to eliminate. (See, ante, at p. 602, fn. 10.) If spending reductions are not items of appropriation, a simple legislative majority could not only overturn a two-thirds vote on the annual budget act, but insulate its new determinations from gubernatorial oversight. This cannot be.

*609 C. Examination of the structure and content of Assembly Bill 4X 1 itself shows that the challenged vetoes were of items of appropriation

Our determination that the challenged vetoes were vetoes of "items of appropriation" is also supported by the structure and content of Assembly Bill 4X 1 itself.
Assembly Bill 4X 1 is an amendment to the 2009 Budget Act. (See Planned Parenthood Affiliates v. Swoap (1985) 173 Cal.App.3d 1187, 1199 [219 Cal.Rptr. 664] [an amendment is a legislative act changing prior or existing law by adding or taking from it some particular provision].) This multi-itemed budget bill[13] contains numerous appropriations. The parties recognize that Assembly Bill 4X 1 contains at least some items of appropriation, concededly subject to the Governor's line-item veto, as a few of the provisions increased spending over that appropriated in the 2009 Budget Act.[14]
Assembly Bill 4X 1 is titled "Budget Act of 2009Revisions" and describes itself in chapter 1 as, "[a]n act to amend and supplement the Budget Act of 2009 ... by amending Items ..., by adding Items ..., and by repealing Items ..., and by amending Sections ..., by adding Sections ... [including those at issue here], and by repealing Section 24.65 of, that act, relating to the State Budget, making an appropriation therefor[e], and declaring the urgency thereof, to take effect immediately." (Assem. Bill 4X 1, italics added.)[15] Hence, both by title and express statement Assembly Bill 4X 1 declares that it amends the 2009 Budget Act by making appropriations. *610 The last section of Assembly Bill 4X 1 recites that the "act is an urgency statute" that "makes revisions in appropriations for the support of the government of the State of California and for several public purposes for the 2009-10 fiscal year."[16] (Assem. Bill 4X 1, § 583, italics added.)
Finally, the Legislative Counsel's Digest for Assembly Bill 4X 1 includes the legend "Appropriation: yes." (Legis. Counsel's Dig., Assem. Bill 4X 1, Stats. 2009, 4th Ex. Sess. 2009-2010, ch. 1, italics added.)[17]
A reasonable reading of Assembly Bill 4X 1 and the Legislative Counsel's Digest leads to the conclusion that the multiple budget items identified in the measure are items of appropriation, as they must be under article IV, section 12, subdivision (d) of the California Constitution, which provides in part: "No bill except the budget bill may contain more than one item of appropriation, and that for one certain, expressed purpose...." (Cal. Const., art. IV, § 12, subd. (d).)[18]
After the Governor exercised his line-item veto, the Legislative Counsel issued an opinion, cited by interveners, concluding that "an item or section of a bill that proposes only to make a reduction in an existing item of *611 appropriation previously enacted in the Budget Act of 2009 is not itself an item of appropriation" and therefore, "in vetoing items of sections of [Assembly Bill 4X 1] that proposed only reductions to existing appropriations enacted by the Budget Act of 2009, the Governor exceeded his `line-item' veto authority." (Ops. Cal. Legis. Counsel, No. 0920928 (Aug. 5, 2009) Governor's Line-Item Veto Authority: Reductions to Existing Appropriations, pp. 1, 4.)[19] We are not persuaded.
(7) "While an opinion of the Legislative Counsel is entitled to respect, its weight depends on the reasons given in its support." (Santa Clara County Local Transportation Authority v. Guardino (1995) 11 Cal.4th 220, 238 [45 Cal.Rptr.2d 207, 902 P.2d 225].) Because the conclusions of Legislative Counsel seem to us little more than a series of ipse dixits, we accord them "little weight." (Ibid.) Moreover, opinions of the Legislative Counsel are persuasive because they are ordinarily "prepared to assist the Legislature in its consideration of pending legislation" (California Assn. of Psychology Providers v. Rank (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2]) and therefore often shed light on the legislative purpose. The opinion before us, however, was not prepared to assist in the consideration of pending legislation. As it opines on the constitutionality of the Governor's veto of Assembly Bill 4X 1, it is no more persuasive than the views of the parties. Legislative intenti.e., whether the Legislature intended that the items at issue be subject to the Governor's veto poweris irrelevant to our inquiry.
Our conclusion that the items at issue were appropriations is further buttressed by the nature of the relief sought by petitioners and interveners. Petitioners and interveners both contend the provisions of Assembly Bill 4X 1 did not "set aside money for the payment of any claim" because the funds for these programs already had been set aside and spending authority previously had been provided in the 2009 Budget Act. At the same time, however, they ask this court to direct the Controller to pay state funds, in the *612 amounts specified in Assembly Bill 4X 1, for the programs specified therein, based upon the passage of that budget bill.[20] The relief sought is not permitted under the California Constitution, unless appropriations directing it are in place. (Cal. Const., art. XVI, § 7.) Article XVI, section 7 provides: "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." (Italics added.) The constitutional requirement is further elaborated by Government Code section 12440, which provides: "The Controller shall draw warrants on the Treasurer for the payment of money directed by law to be paid out of the State Treasury; but a warrant shall not be drawn unless authorized by law, and unless ... unexhausted specific appropriations provided by law are available to meet it." (Italics added.) In seeking payments from the Controller from state funds in the amounts set aside in Assembly Bill 4X 1, for the programs identified therein, and according to the terms of that bill, petitioners and interveners implicitly acknowledge that the provisions of that budget measure are items of appropriation.
The content and structure of Assembly Bill 4X 1 thus support our conclusion that the provisions at issue are items of appropriation subject to reduction or elimination by the Governor's use of the line-item veto power.
Identification of the Assembly Bill 4X 1 legislative reductions as items of appropriation is consistent with the reenactment and single-subject rules of the California Constitution, article IV, section 9,[21] and the mandate of article IV, section 12, subdivision (d), that "[n]o bill except a budget bill may contain more than one item of appropriation ...." Petitioners' and interveners' claims to the contrary are not persuasive.
First, if, as interveners claim, Assembly Bill 4X 1 amendments to the 2009 Budget Act do not reenact the items of appropriation they purport to change, *613 the measure would violate the directive of article IV, section 9 of the California Constitution that "[a] section of a statute may not be amended unless the section is re-enacted as amended." Second, if the reduced Assembly Bill 4X 1 items at issue are not items of appropriation, Assembly Bill 4X 1 would seemingly violate the single-subject requirement of article IV, section 9, as a budget bill dealing with more than the single subject of appropriations. Finally, if Assembly Bill 4X 1 is not a "budget bill," as petitioners claim, it violates the provisions of article VI, section 12, subdivision (d), that only a budget bill may contain more than one item of appropriation.
Petitioners and interveners deal with the foregoing problems in very differentand often contradictoryways.
Petitioners try to shield the items in question from reduction by the Governor by claiming that, as to the seven sections of Assembly Bill 4X 1 at issue, the Legislature neither repealed nor reenacted the appropriations signed by the Governor in the 2009 Budget Act. As earlier pointed out, the California Constitution provides that "[a] section of a statute may not be amended unless the section is re-enacted as amended." (Cal. Const., art. IV, § 9.)
Petitioners argue that the language used by the Legislature in effecting reductions differentiates those sections of Assembly Bill 4X 1 that "amend," and therefore reenact, sections of the 2009 Budget Act, from other sections that merely "added" sections to the 2009 Budget Act containing items (those at issue here) that petitioners and interveners contend are not appropriations. (Interveners do not endorse this argument. They contend that none of the Assem. Bill 4X 1 reductions, no matter how phrased, is an "item of appropriation.") Petitioners posit two sections of Assembly Bill 4X 1 as illustrative:
"Section 399 of [Assembly Bill 4X 1], as passed by the Legislature amended the Budget Act as follows:
"`SEC. 399. Item XXXX-XXX-XXXX of Section 2:00 of the Budget Act of 2009 is amended to read:
"`XXXX-XXX-XXXXFor support of Department of Education .... 38,210,000.' [(Assem. Bill 4X 1, § 399, italics added.)]" (Petitioners note the amount previously appropriated in the 2009 Budget Act was $43,139,000, so *614 in effect Assem. Bill 4X 1 reduced the amount for this item by $4,929,000. (2009 Budget Act, Item XXXX-XXX-XXXX, No. 1 West's Cal. Legis. Service, p. 494.))[22]
Petitioners "note that this amendment makes no mention of the reduction from the previously appropriated amount; it simply proposes to replace the original text with a new sum. Thus, it may be argued, it represents an entirely new appropriation upon which the Governor may justly use his veto power."
Petitioners contrast section 399 (a section not at issue in this litigation) with "the amendment proposed in Section 572 of [Assembly Bill 4X 1], which will reduce funding for the Healthy Families Program:
"`SEC. 572. Section 18.20 is added to the Budget Act of 2009, to read:
"`Sec. 18.20. (a) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $125,581,000.' [(Assem. Bill 4X 1, § 572, italics added.)]" (The amount previously appropriated in the 2009 Budget Act was $377,487,000, so the effect is that a sum of $251,906,000 is set aside for this program. (2009 Budget Act, Item XXXX-XXX-XXXX, No. 1 West's Cal. Legis. Service, p. 428.))
The specific sums set aside for the particular programs are easily ascertained from Assembly Bill 4X 1, by simply subtracting the dollar amount of the reductions from the original amounts appropriated in the 2009 Budget Act.
Petitioners argue that although the two amendments have similar effect reducing the amount originally set aside under the 2009 Budget Act"the direct amendment and reenactment of previously passed items of appropriation in the manner of proposed Section 399 arguably exposes them to the [G]overnor's line-item power ...; no such authority exists ... with respect to the reductions made in the manner of Section 572."
In essence, Petitioners argue that the Legislature may do by indirection that which it cannot do directly, that is, it may insulate certain items of appropriation from the Governor's line-item veto power by the language used, where other items having the identical effect of reducing the sums appropriated in the 2009 Budget Act would be subject to that power. This, the Legislature may not do. (See Wood v. Riley, supra, 192 Cal. at pp. 304-305.) As amici curiae former Governors observe: "If by simple wordsmithing the legislative branch can create an omnibus spending bill limiting the Governor's oversight *615 only to veto of the entire bill, then the budgetary process is reduced to a game of `chicken' daring a [G]overnor to bring state government to a halt through a veto."
(8) Whether identified in Assembly Bill 4X 1 as amendments of, revisions to, or additions to the 2009 Budget Act, it is clear that every provision of Assembly Bill 4X 1 changed a section of the 2009 Budget Act. In Planned Parenthood Affiliates v. Swoap, supra, 173 Cal.App.3d 1187, 1199, we recognized that "[a]n amendment has been described as ` "a legislative act designed to change some prior or existing law by adding or taking from it some particular provision."' [Citation.]" Consequently, the sections that were "added." like those that expressly "amended" the 2009 Budget Act, reenacted those provisions and were subject to the line-item veto or reduction by the Governor. (See also People v. Western Fruit Growers (1943) 22 Cal.2d 494, 501 [140 P.2d 13].)
Interveners approach the problem from a different perspective. The key question, as they see it, is not whether the reenactment rule applies, but the effect of its application. Interveners agree that Assembly Bill 4X 1 fulfills the purpose of the reenactment rule of avoiding confusion on the part of the Legislature and the public that often results when amendments direct the insertion, omission or substitution of certain words or additions of provisions without setting out the entire context of the section to be amended. (White v. State of California (2001) 88 Cal.App.4th 298, 313-314 [105 Cal.Rptr.2d 714].) Interveners contend, however, that when viewed in tandem with Government Code section 9605, the effect of the article IV, section 9 reenactment rule of the California Constitution was that the only provisions of the 2009 Budget Act that were reenacted by adoption of the reductions in Assembly Bill 4X 1 were those that were changed, that is, the amount of each reduction.
(9) Government Code section 9605 states: "Where a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions which are not altered are to be considered as having been the law from the time they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment." The effect of Government Code section 9605 is "to avoid an implied repeal and reenactment of unchanged portions of an amended statute, ensuring that the unchanged portion operates without interruption." (In re Lance W. (1985) 37 Cal.3d 873, 895 [210 Cal.Rptr. 631, 694 P.2d 744].) Scaffolding their arguments on this structure, petitioners and interveners assert that by changing only the amount of the *616 appropriation in the provisions of Assembly Bill 4X 1 at issue, the Legislature did not reenact the corresponding items of appropriation of the 2009 Budget Act but merely reduced the "amount."
This argument would have us parse a putative "item of appropriation" into three separate parts: the "setting aside," the "amount" thereof, and the "particular purpose" to which that amount may be put. So divided, petitioners and interveners maintain that Assembly Bill 4X 1 changed only the "amount" of the items in Assembly Bill 4X 1 at issue, and none of the changes fit the tripartite definition of "item of appropriation." The flaw in this imaginative argument is that the "setting aside" and the "amount" thereof are fundamentally indivisible. The act of setting aside is meaningful only with respect to the designated amount. The "spending authority" granted by a proposed "item of appropriation" is the combination of a setting aside of a designated sum and no more, for a particular purpose.
(10) If petitioners and interveners are correct that the many reductions at issue here did not constitute items of appropriation, and so cannot be selectively vetoed or further reduced by the Governor, then, because each item involves a different statutory program, the entire bill might be invalid as a violation of the single-subject rule. (See Planned Parenthood Affiliates v. Swoap, supra, 173 Cal.App.3d at pp. 1198-1199.) "In California, legislators and state agencies have repeatedly been reminded by the Attorney General that `[a]nnual budget acts, like all other enactments of the Legislature, are subject to the provisions of section [9], Article IV, of the California Constitution,' which sets forth the single[-]subject rule. [Citations.] ... [O]ur Supreme Court recently agreed that `"`the budget bill may deal only with the one subject of appropriations to support the annual budget,'" and thus "`may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess'" or to "`substantively amend[] and chang[e] [e]xisting statute law.'"' [Citation.]" (Planned Parenthood Affiliates v. Swoap, at pp. 1198-1199.)
In Harbor, supra, 43 Cal.3d 1078, the court held the trailer bill containing multiple statutory amendments intended to implement the appropriations previously set forth in the annual budget act violated the single-subject rule, as the number and scope of topics contained therein covered numerous unrelated subjects. The court rejected the claim that the provisions of the trailer bill were "reasonably germane" to the objects of the measure, which were asserted to be to "`fiscal affairs'" and "`statutory adjustments.'" (Id. at pp. 1100-1101.) According to the court, in such case, the bill "encompass[ed] matters of `excessive generality'" (id. at p. 1100), as "[t]he number and scope of topics germane to `fiscal affairs' in this sense is virtually unlimited." (Id. at pp. 1100-1101.)
*617 (11) Relying on League of Women Voters v. Eu (1992) 7 Cal.App.4th 649 [9 Cal.Rptr.2d 416], petitioners are confident that Assembly Bill 4X 1 would pass muster under the single-subject rule if the items in the measure vetoed by the Governor are not "items of appropriation." League of Women Voters v. Eu, which distinguished Harbor, supra, 43 Cal.3d at page 1098, rejected a single-subject rule challenge to a proposed ballot initiative combining reductions to welfare benefits with other provisions that would increase the power of the Governor in fiscal crises. Reasoning that the object of the initiative was not simply "fiscal affairs" or "statutory adjustments," as in Harbor, the court concluded that the "overall theme and driving purpose" of the initiative was to obtain a balanced budget, and budget balancing was a sufficiently narrow single subject for purposes of the single-subject rule. (League of Women Voters v. Eu, at p. 666.) We do not share petitioners' certainty that Assembly Bill 4X 1 has a comparable unifying theme apart from the fact that its substantive provisions appropriate money from the public treasury for specified purposes. We need not decide the question, however. It is for our purposes sufficient that petitioners' interpretation would present a substantial constitutional question, which, whenever possible, we are obliged to avoid. (Palermo v. Stockton Theatres, Inc. (1948) 32 Cal.2d 53, 65 [195 P.2d 1]; Kollander Construction, Inc. v. Superior Court (2002) 98 Cal.App.4th 304, 314 [119 Cal.Rptr.2d 614], disapproved on other grounds in Le Francois v. Goel (2005) 35 Cal.4th 1094, 1107, fn. 5 [29 Cal.Rptr.3d 249, 112 P.3d 636] ["We are constrained to avoid constitutional questions where other grounds are available and dispositive ..."]; see Elkins v. Superior Court (2007) 41 Cal.4th 1337, 1357 [63 Cal.Rptr.3d 483, 163 P.3d 160].)
Somewhat inexplicably, petitioners maintain in their traverse that the legislative process undertaken pursuant to the Governor's proclamation of a fiscal emergency that culminated in Assembly Bill 4X 1 did not create a "budget bill" containing "items of appropriation" and could not violate the single-subject rule. They argue that "the claim that Assembly Bill [4X] 1 is a budget bill, ... conflicts with the text of [the California Constitution,] [a]rticle IV, [section] 10[, subdivision] (f)(1), referencing the passage of `the budget bill' and [section] 10[, subdivision] (f)(3), contemplating a separate bill `addressing the fiscal emergency' to be passed following passage of the budget bill." We fail to see any conflict. That the 2009 Budget Act was indisputably a "budget bill" does not make Assembly Bill 4X 1 any less a "budget bill." Were it otherwise, Assembly Bill 4X 1, which contains multiple items of appropriationat least four that petitioners and interveners concede are appropriationsfor diverse purposes, would be in direct conflict with the mandate of article IV, section 12, subdivision (d), that only a budget bill may contain more than one item of appropriation, as well as potentially running afoul of the single-subject rule of article IV, section 9.
*618 (12) Contrary to petitioners, interveners acknowledge that "[a] bill amending a budget bill, particularly one passed under the fiscal emergency procedures of article IV, section 10(f), is a budget bill within the meaning of article IV, section 12(d)'s requirement that only the budget bill may contain more than one item of appropriation." (Italics added.) Interveners suggest, however, that the reenactment rule of article IV, section 9 (providing in part that "[a] section of a statute may not be amended unless the section is re-enacted as amended") does not apply to the budget, arguing that an item of appropriation is not a "section of a statute." This suggestion flies in the face of article IV, section 10, subdivision (a) [a "bill passed by the Legislature... becomes a statute if it is signed by the Governor"] and the recognition by Assembly Bill 4X 1 that "[t]his act is an urgency statute ...." (Assem. Bill 4X 1, § 583, italics added; see also Legis. Counsel's Dig., Assem. Bill 4X 1 ["This bill would declare that it is to take effect immediately as an urgency statute."].)

III. Separation of Powers
Interveners' contention that the amounts designated by the items of Assembly Bill 4X 1 at issue should not be reducible by the Governor is based in part on a separation of powers theory, also advanced by amici curiae SEIU California State Council et al. This claim is built upon (1) the absence in our California Constitution of explicit gubernatorial authority to increase or decrease the size of spending cuts made by the Legislature in response to a declaration of fiscal emergency, and (2) the language in Harbor, supra, 43 Cal.3d 1078, emphasizing that, as interveners put it, "the power to veto, reduce or eliminate is not the power to create or increase," such as, for example, the Supreme Court's observations that "[t]he word `veto' means `I forbid' in Latin.... [T]he effect of the veto [is] negative, frustrating an act without substituting anything in its place." (Id. at p. 1085.)
As interveners see it, in making the challenged line-item vetoes, "the Governor sought to use his power to increase what the Legislature had done. The Legislature had made a policy determination regarding how much state spending had to be cut in response to the fiscal crisis and where those spending cuts were to be made. The Governor, however, disagreed with the Legislature's policy determinations. He wanted to make more cuts in order to keep a larger budget reserve." According to interveners, the Governor's preference for a larger budget reserve is a policy determination belonging to the legislative, not the executive, branch. Facially intriguing, this argument amounts to little more than wordplay.
Whether the items in Assembly Bill 4X 1 at issue are appropriations cannot be determined by seeing the Governor's use of the veto power only as *619 increasing the Legislature's reductions and characterizing that as an impermissibly affirmative or "creative" act. For one thing, treating the veto as an increase in the reduction rather than as a decrease in the appropriation is as arbitrary as describing a glass of water as half full rather than half empty. By increasing the Legislature's reduction, the Governor decreases the size of the appropriation. What matters is not whether the Governor's act is seen as affirmative or negative, but its purpose and practical effect.
The difference of opinion between the Legislature and the Governor was not whether the amount of particular items of appropriation enacted in the 2009 Budget Act needed to be reduced, but the magnitude of the reductions. What mattered in the end were the amounts set aside for particular purposes; the Legislature wanted higher amounts than did the Governor. While the Governor's line-item vetoes may be said to have "increased" the reductions made by the Legislature as to the items at issue, the most significant effect of the vetoes, and their purpose, was to further reduce the amounts set aside by the Legislature. The Governor's wielding of the line-item veto was therefore quintessentially negative, as it lowered the cap on the spending authority for specified purposes, providing precisely the type of check on the Legislature intended by the constitutional initiative that adopted the line-item veto, empowering the Governor "to reduce an appropriation to meet the financial condition of the treasury." (Ballot Pamp., Gen. Elec. (Nov. 7, 1922) argument in favor of Prop. 12, pp. 78-79.)
Interveners' separation of powers argument thus begs the question. To be sure, the Governor's challenged acts were legislative in nature and, "[a]s an executive officer, [the Governor] is forbidden to exercise any legislative power or function except as ... the constitution expressly provide[s]." (Lukens v. Nye, supra, 156 Cal. at p. 501.) The question is not whether the gubernatorial act at issue is legislative, but whether it is constitutionally authorized. As earlier explained, we find it authorized by the statement in article IV, section 10, subdivision (e) of our California Constitution, that "[t]he Governor may reduce or eliminate one or more items of appropriation while approving other portions of a bill."
Nor are we impressed by the "anomalies" interveners contend would flow from finding the Governor's use of the line-item veto here is within constitutional bounds. Interveners contend, for example, that our reliance on article IV, section 9 of the California Constitution, for the conclusion that Assembly Bill 4X 1 reenacted those portions of the 2009 Budget Act that it amended, would allow the Governor to reduce the amount of funding authorized by a bill making only nonsubstantive technical changes to a previously enacted and unchanged appropriation, and also subject the measure to the two-thirds vote requirement. Interveners also posit that it would also permit the Governor to *620 "eliminate" a reduction to a previously enacted appropriation, thereby allowing more spending than the Legislature authorized which, they maintain, is not the use of the veto as a "negative" check on the Legislature, but the opposite.[23]
(13) We need not address these issues as they are not before us. However, we do think it appropriate to point out that the Governor's veto power does not give him the last word. The Legislature retains the ability to override the Governor's veto of items of appropriation in the same manner as other bills, by separately reconsidering and passing them by a two-thirds majority of each house. (Cal. Const., art. IV, § 10, subds. (a), (e).) Nor do we here address the validity of the Governor's attempted allocation or splitting of his further reductions among various programs or portions of programs where Assembly Bill 4X 1 simply contained a lump sum reduction in a single item of appropriation. (But see Harbor, supra, 43 Cal.3d at pp. 1090-1091.)[24]

CONCLUSION
(14) In article IV, section 10, subdivision (e), the California Constitution grants the Governor the limited legislative power to exercise the line-item veto to eliminate or reduce "items of appropriation." For the reasons set forth in this opinion, we conclude that the particular Assembly Bill 4X 1 budget reductions at issue here were "items of appropriation" within the meaning of article IV, section 10, subdivision (e), and that the Governor's line-item vetoes reducing them, while approving other portions of Assembly Bill 4X 1, was therefore constitutionally authorized.

*621 DISPOSITION
The petition for writ of mandate is denied.
Lambden, J., and Richman, J., concurred.
NOTES
[1] Other petitioners are Rosa Navarro and Lionso Guzman, individual residents of Los Angeles County who have received medical treatment from St. John's Well Child and Family Center; California Foundation for Independent Living Centers (the Foundation), a statewide, nonprofit organization made up of 25 independent living centers providing services and advocacy by and for people with all types of disabilities; Nevada Sierra Regional IHSS (In Home Supportive Services) Public Authority, a public agency whose purpose is to make the IHSS component of the foundation work better for consumers; Californians for Disability Rights, California's oldest and largest membership organization of persons with disabilities; and Liane Yasumoto and Judith Smith, who each receive IHSS to assist with daily living tasks.
[2] The Governor and Controller are sued in their official capacities only.
[3] Amicus curiae briefs on behalf of petitioners have been filed by the following amici curiae: Santa Clara County; SEIU California State Council, United Domestic Workers, and California United Homecare Workers; Children Now, Valley Community Clinic, Eisner Pediatric & Family Medical Center, the Saban Free Clinic, YWCA Monterey County, Westside Family Health Center, Community Clinic Association of Los Angeles County, and The Legal Aid Association of California; Aids Project Los Angeles; and the Los Angeles County Democratic Central Committee and the Riverside County Democratic Central Committee.

An amicus curiae brief in support of respondents Governor Schwarzenegger and Controller Chiang has been filed by amici curiae George Deukmejian, Pete Wilson, Gray Davis, the California Chamber of Commerce, the California Taxpayers' Association and the California Business Roundtable (collectively, amici curiae former California governors).
[4] At oral argument, we expressed our intention to take judicial notice (Evid. Code, §§ 451, 452) upon interveners' request of various materials relating to the passage of the 2009 Budget Act, Assembly Bill 4X 1 and the Revised 2009 Budget Act. Interveners' request for judicial notice was unopposed. Accordingly, we take judicial notice of the following materials:

a. Senate Bill No. 1 (2009-2010 3d Ex. Sess.) approved by the Governor on February 20, 2009;
b. Assembly Bill 4X 1 (2009-2010 4th Ex. Sess.) as amended by the Senate on July 23, 2009;
c. Assembly Bill 4X 1 (2009-2010 4th Ex. Sess.) as approved by the Governor on July 28, 2009 (containing the Governor's Veto Message);
d. Legislative Counsel Opinion No. 0920928 (Aug. 5, 2009) Governor's Line-Item Veto Authority: Reductions to Existing Appropriations;
e. Ballot Pamphlet, General Election, November 7, 1922, text and arguments in favor of Proposition 12 ("State Budget Amendment"), which enacted a constitutional amendment expanding the scope of the line-item veto;
f. Voter Information Guide, Special Statewide Election, November 8, 2005, text and analysis of voter initiative Proposition 76 ("State Spending and School Funding Limits");
g. Secretary of State's "Statement of Vote" on Proposition 76;
h. Voter Information Guide, Special Election, May 19, 2009, text and analysis of Proposition 1A ("State Budget. Changes California Budget Process. Limits State Spending. Increases `Rainy Day' Budget Stabilization Fund");
i. Secretary of State's "Statement of Vote" on Proposition 1A.
We also take judicial notice (Evid. Code, §§ 459, 452), at the Governor's request, of the following ballot materials presented to the voters when they were considering two measures: (1) Proposition 58: Voter Information Guide, Supplemental, Primary Election, March 2, 2004, text and analysis of Proposition 58 ("The California Balanced Budget Act"), adding article IV, section 10, subdivision (f) to the California Constitution; (2) Proposition 12: Ballot Pamphlet, General Election, November 7, 1922, text and arguments in favor of Proposition 12 (same material as item e, ante, in different format).
[5] California Constitution, article IV, section 10, subdivision (f), provides: "(1) If, following the enactment of the budget bill for the 2004-05 fiscal year or any subsequent fiscal year, the Governor determines that, for that fiscal year, General Fund revenues will decline substantially below the estimate of General Fund revenues upon which the budget bill for that fiscal year, as enacted, was based, or General Fund expenditures will increase substantially above that estimate of General Fund revenues, or both, the Governor may issue a proclamation declaring a fiscal emergency and shall thereupon cause the Legislature to assemble in special session for this purpose. The proclamation shall identify the nature of the fiscal emergency and shall be submitted by the Governor to the Legislature, accompanied by proposed legislation to address the fiscal emergency.

"(2) If the Legislature fails to pass and send to the Governor a bill or bills to address the fiscal emergency by the 45th day following the issuance of the proclamation, the Legislature may not act on any other bill, nor may the Legislature adjourn for a joint recess, until that bill or those bills have been passed and sent to the Governor.
"(3) A bill addressing the fiscal emergency declared pursuant to this section shall contain a statement to that effect."
[6] On August 10, 2009, intervener Steinberg filed a complaint in the San Francisco Superior Court, seeking a writ of mandate addressing the same issue presented herein and challenging the Governor's use of the line-item veto on items in Assembly Bill 4X 1. On August 17, 2009, Steinberg informed this court that his petition was pending in the superior court and explained that it challenged not only the items challenged here by petitioners, but an additional 14 uses of the line-item veto. Following our August 17, 2009 request to respondents to address all issues raised by the petitioners' writ petition, Steinberg and Assembly Speaker Bass sought to intervene and urged this court to issue the original writ as sought by petitioners. On September 14, 2009, we granted their motion to intervene and accepted their writ petition for filing.
[7] As enacted by the Legislature, and submitted to the Governor, the relevant provisions of Assembly Bill 4X 1 provide in pertinent part:

"SEC. 568. Section 17.50 is added to the Budget Act of 2009, to read: [¶] Sec. 17.50. The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $9,483,000." (Assem. Bill 4X 1, § 568 [Dept. of Aging].)
"SEC. 570. Section 18.00 is added to the Budget Act of 2009, to read: [¶] Sec. 18.00. (a) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $2,789,402,000. [¶] ... [¶] (e) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $4,303,000." (Assem. Bill 4X 1, § 570 [Dept. of Health Care Services].)
"SEC. 571. Section 18.10 is added to the Budget Act of 2009, to read: [¶] Sec. 18.10. [¶] ... [¶] (c) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $62,967,000." (Assem. Bill 4X 1, § 571 [Dept. of Public Health].)
"SEC. 572. Section 18.20 is added to the Budget Act of 2009, to read: [¶] Sec. 18.20. (a) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $125,581,000." (Assem. Bill 4X 1, § 572 [for local assistance Managed Risk Medical Insurance Board, for Healthy Families Program].)
"SEC. 573. Section 18.30 is added to the Budget Act of 2009, to read: [¶] Sec. 18.30. (a) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $214,828,000." (Assem. Bill 4X 1, § 573 [Dept. of Developmental Services, for Regional Centers].)
"SEC. 574. Section 18.40 is added to the Budget Act of 2009, to read: [¶] Sec. 18.40. [¶] ... [¶] (e) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $3,547,000." (Assem. Bill 4X 1, § 574 [Dept. of Mental Health, for caregiver resource centers serving families of adults with acquired brain injuries].)
"SEC. 575. Section 18.50 is added to the Budget Act of 2009, to read: [¶] Sec. 18.50. [¶] ... [¶] (d) The amount appropriated in Item XXXX-XXX-XXXX of Section 2.00 is hereby reduced by $643,248,000." (Assem. Bill 4X 1, § 575 [for local assistance, Dept. of Social Services].)
[8] At the Governor's request, and over the objection of interveners, we take judicial notice of Senate Bill No. 13, passed by the Legislature after the Governor's veto, and signed by the Governor. (Stats. 2009, 3d Ex. Sess. 2009-2010, ch. 29, approved by Governor Oct. 21, 2009.) That bill transferred $16.3 million from the Alternative and Renewable Fuel and Vehicle Technology Fund to the general fund as a loan to appropriate those funds to the California Emergency Management Agency to support domestic violence shelters for the 2009-2010 fiscal year.
[9] Article IV, section 10 of the California Constitution provides in part: "(a) Each bill passed by the Legislature shall be presented to the Governor. It becomes a statute if it is signed by the Governor. The Governor may veto it by returning it with any objections to the house of origin, which shall enter the objections in the journal and proceed to reconsider it. If each house then passes the bill by rollcall vote entered in the journal, two-thirds of the membership concurring, it becomes a statute. [¶] ... [¶]

"(e) The Governor may reduce or eliminate one or more items of appropriation while approving other portions of a bill. The Governor shall append to the bill a statement of the items reduced or eliminated with the reasons for the action. The Governor shall transmit to the house originating the bill a copy of the statement and reasons. Items reduced or eliminated shall be separately reconsidered and may be passed over the Governor's veto in the same manner as [vetoed] bills."
[10] The ballot argument in favor of the 1922 constitutional initiative that empowered the Governor to exercise the line-item veto to reduce an item of appropriation stated in relevant part: "The budget system will save the taxpayer money, because all state appropriations will be handled in a business way, duplications prevented and extravagance avoided. The proposed measure will also enable the Governor to reduce an appropriation to meet the financial condition of the treasury, which under our present system he can not do. Frequently a worthy measure is vetoed because the legislature passes a bill carrying an appropriation for which sufficient funds are not available. Under present conditions the Governor is compelled to veto the act, no matter how meritorious, because of the excessive appropriation, whereas, if he had the power given by the proposed constitutional amendment, he could approve the bill with a modified appropriation to meet the condition of the treasury." (Ballot Pamp., Gen. Elec. (Nov. 7, 1922) argument in favor of Prop. 12, pp. 78-79, italics added.)
[11] The issue in Safety Education, supra, 30 Cal.App.4th 1264, was whether the statutory scheme at issue reflected "a continuing appropriation by the Legislature or whether the availability of driver training funding is subject to legislative discretion." (Id. at p. 1282.) The court found the statutory language clear that the funds that may be used to pay for driver training were limited to amounts appropriated in the annual budget act, so that the statutory scheme did not establish a continuing appropriation. (Id. at p. 1283.) The asserted continuing appropriation provisions in Safety Education had no dollar amount listed, and expressly deferred the amount of appropriation to "the annual Budget Act" item that addressed driver's education. (Id. at p. 1272.) The case does not stand for the proposition asserted by petitioners that a limitation upon or reduction of an appropriation does not constitute an appropriation.
[12] Although the precise question whether reductions in appropriations are items of appropriation subject to the Governor's line-item veto is, as we have said, a question of first impression in this state, the Arizona Supreme Court answered the question affirmatively in Rios v. Symington (1992) 172 Ariz. 3 [833 P.2d 20] (Rios), a case relied upon by the Governor. The Rios court rejected the claim that the governor's line-item veto power did not extend to legislative measures decreasing prior appropriations: "When the Legislature transfers monies from a previously-made appropriation, the obvious effect is to reduce the amount of the previous appropriation. The Constitution does not permit such reductions free of gubernatorial oversight. To hold otherwise would permit the Legislature to do indirectly that which it may not do directly, and would seriously limit the Executive's constitutional role in the appropriation process. [¶] ... [¶] In our view, if the Governor's constitutional power to line item veto an appropriation is to mean anything, the Governor must be constitutionally empowered to line item veto a subsequent reduction or elimination of that appropriation." (Id., 833 P.2d at p. 26.)

Although the analysis in Rios, supra, 833 P.2d 20, supports our conclusion, we are aware that the constitutional framework for exercise of the veto power in Arizona described in Rios is different in some critical respects from California's. Unlike ours, Arizona's constitution does not empower its governor to "reduce" an item of appropriation. In addition, because of the terms of the line-item veto in Arizona, the net effect of the governor's veto in Rios was to reinstate the original appropriation. We cannot tell how much weight the court placed upon this factor. Consequently, although Rios addresses issues similar to those presented here, significant differences between the Arizona and California constitutional schemes regarding the line-item veto prevent us from finding it particularly persuasive.
[13] Petitioners dispute that Assembly Bill 4X 1 was a "budget bill." (See, post, at pp. 617-618.)
[14] The Governor maintains, and petitioners and interveners do not dispute, that section 10 of Assembly Bill 4X 1 increased funding for Item XXXX-XXX-XXXX, for support of the judicial branch; section 61 increased funding for Item XXXX-XXX-XXXX, for support of the California Emergency Management Agency; section 149 increased funding for Item XXXX-XXX-XXXX, for support of the Board of Pilot Commissioners; and section 318 increased Item XXXX-XXX-XXXX, for support of the Department of Public Health. (Assem. Bill 4X 1, §§ 10, 61, 149, 318.)
[15] Assembly Bill 4X 1 is titled "Budget Act of 2009Revisions" and states it is "[a]n act to amend and supplement the Budget Act of 2009 ... by amending Items [there follows a list of more than 350 items by number], by adding Items [there follows a list of more than 100 items by number], and by repealing Items [there follows a list of more than 40 items by number], and by amending Sections [there follows a list of 10 sections], and by adding Sections [there follows a list of 21 sections, including those sections 17.50, 18.00 through 18.50 at issue here], and by repealing Section 24.65 of, that act, relating to the State Budget, making an appropriation therefor[e] and declaring the urgency thereof, to take effect immediately." (Assem. Bill 4X 1, italics added.)
[16] "This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessity are: [¶] This act makes revisions in appropriations for the support of the government of the State of California and for several public purposes for the 2009-10 fiscal year. It is imperative that these revisions be made effective as soon as possible. It is therefore necessary that this act go into immediate effect." (Assem. Bill 4X 1, § 583.)
[17] The Legislative Counsel's Digest states: "The Budget Act of 2009 (Chapter 1 of the 2009-10 Third Extraordinary Session) made appropriations for the support of state government for the 2009-10 fiscal year.

"This bill would make revisions in those appropriations for the 2009-10 fiscal year. The bill would make specified reductions in certain appropriations.
"The California Constitution authorizes the Governor to declare a fiscal emergency and to call the Legislature into special session for that purpose. The Governor issued a proclamation declaring a fiscal emergency, and calling a special session for this purpose, on July 1, 2009.
"This bill would state that it addresses the fiscal emergency declared by the Governor by proclamation issued on July 1, 2009, pursuant to the California Constitution.
"This bill would declare that it is to take effect immediately as an urgency statute.
"Appropriation: yes." (Legis. Counsel's Dig., Assem. Bill 4X 1.)
[18] "No bill except the budget bill may contain more than one item of appropriation, and that for one certain, expressed purpose. Appropriations from the General Fund of the State, except appropriations for the public schools, are void unless passed in each house by rollcall vote entered in the journal, two-thirds of the membership concurring." (Cal. Const., art. IV, § 12, subd. (d).)
[19] Like petitioners and interveners, the Legislative Counsel's opinion concludes that "[t]he legal effect of an item or section of a bill that solely makes a reduction of a previously appropriated amount is not to grant authority to a state officer to expend a specified sum, but to lessen that authority. Unlike an appropriation, the reduction of an existing appropriation does not set aside moneys for payment of a claim or make a new appropriation of moneys from the public treasury, nor does it add additional amounts to funds already provided for by an existing appropriation or identify a new purpose for which moneys may be expended. A state officer is not granted new expenditure authority, nor is a state officer's expenditure authority extended in any way by an item or section of a bill that solely makes a reduction of an existing appropriation." (Ops. Cal. Legis. Counsel, No. 0920928, supra, Governor's Line-Item Veto Authority: Reductions to Existing Appropriations, at p. 4, fn. omitted.)
[20] Petitioners request, among other things, that this court issue a writ of mandate directing respondents "[t]o take all actions necessary to ensure that the moneys appropriated in the Budget Act of 2009, as amended and supplemented by [Assembly Bill 4X 1], and excluding the Governor's purported vetoes thereto, be disbursed and continue to be disbursed as directed in accordance with the laws of California." Interveners seek a writ of mandate "requiring respondents to provide for the full amount of appropriations made by the Legislature under the Budget Act of 2009, as reduced and revised by [Assembly Bill 4X 1], without regard to the reductions purported to be made by respondent [Governor] ...."
[21] Article IV, section 9 of the California Constitution provides in its entirety: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended."
[22] Bracketed insertions are ours, not petitioners'.
[23] This would also have occurred if the Governor had vetoed Assembly Bill 4X 1 in its entirety. However, interveners do not argue the entire bill was not subject to veto or that exercise of such veto would be an impermissibly creative act rather than one that is permissibly negative.
[24] Interveners and petitioners point to the defeat of Proposition 76 at the November 2005 Special Statewide Election and the defeat of Proposition 1A in May 2009, as evidence that the voters did not give the Governor the line-item veto power he exercised here. Proposition 76 would have allowed the Governor unilaterally to make spending reductions if the Legislature failed to enact legislation to deal with a fiscal emergency. (Ballot Pamp., Special Statewide Elec. (Nov. 8, 2005) Prop. 76 ("State Spending and School Funding Limits. Initiative Constitutional Amendment").) Proposition 1A would have allowed the Governor to make certain midyear reductions without legislative approval. (Ballot Pamp., Special Elec. (May 19, 2009) Prop. 1A ("State Budget. Changes California Budget Process. Limits State Spending. Increases `Rainy Day' Budget Stabilization Fund").) These two propositions, which would have expanded executive powers and permitted unilateral spending cuts by the Governor, are irrelevant to the issues presented here. (See American Civil Rights Foundation v. Berkeley Unified School Dist. (2009) 172 Cal.App.4th 207, 219, fn. 9 [90 Cal.Rptr.3d 789] [denying a request for judicial notice of ballot arguments regarding a later, failed initiative on the same general topic as Prop. 209, and instead choosing to "focus our attention on the voters' intent in 1996, when they adopted Proposition 209"].)